**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MERIMA GVOZDEN, | ) | |
| | ) | |
|           Plaintiff | ) | Case No. 10-cv-04595 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| MILL RUN TOURS, INC., et al., | ) | |
| | ) | |
|           Defendants, | ) | |

_____

| | | |
|---|---|---|
| NAGI TABET, | ) | |
| | ) | |
|           Plaintiff, | ) | Case No. 10-cv-04606 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| MILL RUN TOURS, INC., et al., | ) | |
| | ) | |
|           Defendants, | ) | |

_____

| | |
|---|---|
| MILL RUN TOURS, INC., | ) |
| | ) |
|           Counter-Plaintiff/ | ) |
|           Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NAGI TABET and MERIMA GVOZDEN, | ) |
| | ) |
|           Counter-Defendants, | ) |
| and | ) |
| | ) |
| COSMOPOLITAN TRAVEL SERVICE, INC., | ) |
| | ) |
|           Third-Party Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Nagi Tabet and Merima Gvozden have sued their former employer, Mill Run, and its employees, Pierre Azzi, Ibrahim Akiki, Jimmy Daher.[1]  Prior to this action, Defendants reported Plaintiffs to the State's Attorney's office, claiming that Plaintiffs (1) diverted Mill Run's customers to its competitor, Cosmopolitan, and (2) diverted Mill Run's money to Gvozden's travel agency, M&M.  Plaintiffs were tried for theft and wire fraud and found not guilty.  After their acquittal, Plaintiffs brought this action, alleging false arrest, malicious prosecution, and intentional infliction of emotional distress in connection with Defendants' role in the underlying arrests and prosecution.  Tabet additionally alleges breach of contract and conversion/theft, claiming that Mill Run failed to pay him pursuant to his employment contract and that Akiki stole money from him.

Defendants have filed counterclaims and third-party claims against Plaintiffs and Cosmopolitan, alleging that Plaintiffs diverted customers to Cosmopolitan and money to M&M. They additionally allege that Tabet helped Cosmopolitan obtain a lease and a bank account for its new Chicago office and that Tabet recruited at least one Mill Run employee to join him when he moved to that office.  Based on this conduct, Defendants allege a breach of fiduciary duty, intentional interference with prospective business, fraudulent concealment, and conspiracy, among other claims.  Defendants move for summary judgment on Plaintiffs' claims and these counterclaims/third-party claims.  For the reasons stated below, the Court grants Defendants' motions as to Plaintiffs' false arrest and malicious prosecution claims and denies the motions as to all other claims/counterclaims/third-party claims.

---

[1] Plaintiffs also bring § 1983 claims against non-moving Defendants Lincolnwood and Schenita Stewart, creating subject matter jurisdiction under 28 U.S.C. § 1331.

## I.      Background

The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements.  Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and which entitles the movant to judgment as a matter of law.  It requires that factual allegations be supported by admissible record evidence.  See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000).  "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."  L.R. 56.1(b)(3)(C). The Court carefully reviews statements of material facts and eliminates from consideration any assertions unsupported by the documented evidence or arguments.  See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, at*2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004). Where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted.[2]

Defendant Mill Run is a travel consolidator that purchases airline tickets and sells them to travel agency customers at a mark-up.  Defs. SOF at ¶ 10.  As a wholesaler, it only sells tickets to travel agencies, not consumers.  Gvozden SOF at ¶ 3.  Tabet opened Mill Run's Chicago office in 1987.  Tabet and Cosmo. SOF at ¶ 1.  As branch manager, Tabet was responsible for cultivating and developing relationships with travel agents in his region—relationships that

---

[2] Where a party's response fails to provide a version of the facts that differs from the earlier statement to which it responds, this opinion cites only the earlier statement.  This opinion cites to Mill Run's L.R. 56.1 statement as "Defs. SOF"; to Gvozden's Response as "Gvozden Resp. SOF"; to Tabet and Cosmopolitan's Response as "Tabet and Cosmo. Resp. SOF"; to Gvozden as well as Tabet and Cosmopolitan's Responses together as "Pltfs. Resp. SOF"; and to Defendants' Reply as "Defs. Reply SOF."  It cites to Gvozden's statement of additional facts as "Gvozden SOF" and Tabet and Cosmopolitan's statement of additional facts as "Tabet and Cosmo. SOF."  "MSJ" refers to motion for summary judgment.

determined the success of his office. *Id.* at ¶ 3. Generally, Tabet was given significant freedom to run the company as if it were his own, with Mill Run's corporate office in New York auditing his accounts. *Id.* at ¶¶ 1, 2. In February or March of 2006, Tabet had an altercation with an employee from the corporate office, which led to his resignation on May 26, 2006. Defs. SOF at ¶¶ 51, 52, 70. On June 4, 2006, Tabet began working for Mill Run's competitor, Cosmopolitan. *Id.* at ¶ 67, 80.

### A. Croatia Air Tickets

This lawsuit emerges, in part, from Tabet's joint activities with Cosmopolitan before he left Mill Run to work at Cosmopolitan. In the early 2000s, Tabet became aware of customer demand for tickets on Croatia Air, an airline with which Mill Run did not directly contract. Tabet and Cosmo. SOF at ¶¶ 8-10. Starting in 2003, Tabet asked Mill Run to contract with Croatia Air directly, but Mill Run declined to do so. *Id.* at ¶ 9, 10. In January 2006, when Tabet reiterated his request, he was told, "Nagi, we don't have [a contract]. See what you want to do." *Id.* at ¶ 11. Shortly afterwards, at least two of Tabet's customers suggested that they might leave Mill Run unless it started offering Croatia Air tickets. *Id.* at ¶ 12. To retain such customers, Tabet decided to offer Croatia Air tickets in the absence of a direct contract. See *id.* at ¶¶ 12, 15, 17.

There were two ways by which Mill Run could purchase Croatia Air tickets without a direct contract. Defs. SOF at ¶¶ 46-50. Under the first option, Mill Run could purchase a multi-segment package including Croatia Air segments from United or Lufthansa—two airlines with which Mill Run directly contracted. *Id.* at ¶ 46. A package, for example, might consist of (1) a United/Lufthansa departure flight from the United States to a European city, (2) a round-trip Croatia Air ticket between that city and Croatia, and (3) a United/Lufthansa return ticket to the

United States. *Id.* Under the second option, Mill Run could order a Croatia Air ticket directly from Cosmopolitan, a consolidator based out of New York that had a direct contract with Croatia Air. *Id.* at ¶ 48.

Tabet declined to use the first method because it would increase the fare by approximately $200. See *id.* at ¶¶ 46, 47; Tabet and Cosmo. SOF at ¶ 8. Tabet declined to use the second method because it would risk diverting customers from Mill Run to Cosmopolitan; the mechanics of the order and sales process would introduce customers to Cosmopolitan's existence, create potential for direct contact, and therefore risk customer loss. Gvozden. Resp. SOF at ¶ 48. Tabet may have declined to use the second method for an additional disputed reason. According to Tabet and Cosmopolitan, this method offered Mill Run no profit; for some unexplained reason, if Mill Run had added its own mark-up on top of Cosmopolitan's mark-up, it would have lost its ability to sell to travel agencies. Tabet and Cosmo Resp. SOF at ¶ 48; Tabet and Cosmo. SOF at ¶ 21. According to Defendants and Gvozden, however, Mill Run could have earned a commission through these sales. See Defs. Reply SOF at ¶ 49.

Rejecting both methods, Tabet chose a third method, which included the following steps: (1) Travel agencies ordered Croatia Air tickets from Mill Run; (2) Gvozden booked the orders in Mill Run's reservation system; (3) Gvozden released the orders to Cosmopolitan; and (4) Cosmopolitan finalized the sales. Defs. SOF at ¶ 29. Relevant here are two kinds of releases: full and partial. *Id.* at ¶ 33. A partial release enables the releasing party to access, change, and effectively control a reservation post-release. *Id.* In contrast, a full release prevents the releasing party from accessing a reservation at a future time. *Id.* Tabet and Gvozden only partially released the Air Croatia reservations to Cosmopolitan so that Gvozden could maintain access to the reservations in case she received a question from a customer. *Id.* at ¶ 34. They also made

partial releases so that Mill Run would obtain a "segment credit" as the original booking agent. Tabet and Cosmo. SOF at ¶ 16. Using this method, Tabet and Gvozden placed 974 orders for Croatia Air tickets from Cosmopolitan between January and May 2006. Defs. SOF at ¶ 26. While Cosmopolitan earned $20 per ticket, Mill Run made no direct profit. Tabet-Cosmo. SOF at ¶ 21; Gvozden's Resp. SOF at ¶ 38.

Defendants argue that Plaintiffs coordinated and executed these sales surreptitiously to help Cosmopolitan at Mill Run's expense, pointing to several undisputed facts. When Tabet announced the availability of Croatia Air tickets to Mill Run's ticket agents, he did not disclose Cosmopolitan's involvement; he stated only that ticket agents should refer customers requesting Croatia Air tickets to Tabet. Defs. SOF at ¶ 24. In January 2006, he called Gvozden to his private office, informed her of the book-and-release process, and put her exclusively in charge of all Croatia Air orders. *Id.* at ¶ 25. While Gvozden placed the orders, Tabet handled the billing. *Id.* at ¶ 35. Rather than use Mill Run's normal invoicing system, Tabet manually created his own invoices. *Id.* at ¶¶ 35-37. Tabet did not enter the invoices in Mill Run's system or inform the corporate office of the sales, nor did they appear in Mill Run's monthly sales reports. *Id.* at ¶¶ 40-41.

Meanwhile, Plaintiffs contend that Tabet created the manual billing system for Mill Run's own benefit, pointing to the undisputed fact that Tabet omitted Cosmopolitan's contact information from the invoices to avoid putting Mill Run's customers in contact with its competitor. Pltfs. Resp. SOFs at ¶ 38; Tabet and Cosmo. SOF at ¶¶ 17, 18, 20. Consistent with Plaintiffs' contention, Defendants themselves allege in their counterclaim/third-party claim of conspiracy that "customers [of Mill Run purchasing Croatia Air tickets] did not know that the orders were being processed by Cosmopolitan and not Mill Run." Defs. Counterclaim/Third-

party Claim at ¶ 108. Plaintiffs also contend that Tabet had no reason to document the sales in Mill Run's sales reports because of several undisputed facts. First, Mill Run made no profit on these sales. See Gvozden Resp. SOF at ¶ 38. According to Plaintiffs' explanation, Mill Run was just a conduit through which travel agencies, the effective buyers, purchased tickets from Cosmopolitan, the effective seller. See Gvozden Resp. SOF at ¶ 40; Tabet and Cosmo. Add. SOF at ¶ 22. Second, Mill Run historically used a similar practice when it lacked a direct contract with an airline. Tabet and Cosmo. SOF at ¶ 24. Tabet received no instructions prohibiting him from using this practice to offer Croatia Air tickets; the corporate office "never told [Tabet] what to do, what not to do, what's permitted, and what's not permitted. They only [told him], 'We need sales.'" Tabet and Cosmo Resp. SOF at ¶¶ 23, 28, 41.

Lastly, it is undisputed that Tabet never gave Cosmopolitan the addresses of the customer travel agencies and that when Cosmopolitan processed these transactions, it listed the vendor/client as Mill Run, not the travel agencies. Tabet and Cosmo. SOF at ¶ 19.

**B. Tabet's Alleged Assistance in the Opening of the Cosmopolitan Office and His Solicitation of a Mill Run Employee**

In alleging that Tabet helped Mill Run's competitor to its detriment, Defendants point to more than just the Croatia Air sales. They also contend that Tabet helped Cosmopolitan obtain a lease and a bank account for its new Chicago office based on the following undisputed facts. While Tabet was still working at Mill Run, he and Cosmopolitan manager Michael Tsakos agreed to make Tabet the local contact person for Cosmopolitan's lease without Mill Run's knowledge. Defs. SOF at ¶¶ 17, 18, 20. The landlord subsequently sent a rent invoice to Tabet's home address. *Id.* at ¶ 60. On May 19, 2006, Tabet also opened a bank account on Cosmopolitan's behalf, listing himself as one of the signers on the account.[3] *Id.* at ¶¶ 63, 64.

---

[3] In support of this fact, Defendants cite a stipulation by Tabet's counsel at his criminal trial. See Defs.

Defendants also contend that Tabet attempted to help Cosmopolitan at Mill Run's expense by recruiting Mill Run employee Abid Hussain to work for him at Cosmopolitan. *Id.* at ¶¶ 53, 54. Several facts regarding the timing and content of this conversation are in dispute. According to Defendants, Tabet asked Hussain to come work for him at Cosmopolitan while Tabet was still at Mill Run, inaccurately telling Hussain that Mill Run's Chicago office was shutting down. *Id.* at ¶¶ 53, 54. According to Tabet and Cosmopolitan, however, Hussain initiated the conversation, approaching Tabet for the first time in May 2006 after learning that Tabet was leaving. Tabet-Cosmo. Resp. SOF at ¶ 53. Hussain asked Tabet if he could work for him at Cosmopolitan, and Tabet responded negatively, explaining that Hussain could not leave Mill Run because it was sponsoring his work visa. *Id.* Hussain expressed concern that Mill Run would shut down, and Tabet said he disagreed; it was a big company, and nothing would happen to it. *Id.* at ¶ 54.[4]

---

SOF at ¶ 63. Gvozden makes a hearsay objection, unsupported by any explanation. See Gvozden's Resp. SOF at ¶ 65. The stipulation states that a witness from Harris Bank, Janice Anderson, would provide testimony sufficient to place her statements within the business records exception to the hearsay rule, were she called to testify. Fed. R. Evid. 803(6). Accordingly, Gvozden's objection is overruled, and the fact is deemed admitted.

[4] Defendants argue that "Tabet/Cosmo do not properly respond to any of the specific allegations and Hussain testimony as to a Tabet/Hussain conversation which occurred 'a few months before [Tabet] left' . . . and thus admit same." Defs. Reply SOF at ¶ 54. In other words, they argue that Plaintiffs fail to "contest any alleged conversation which occurred [a few months before Tabet left], and instead only reference a purported conversation from May 2006 [when he actually left]," effectively conceding Defendants' account of the first conversation by only disputing the contents of the second conversation. *Id.* Defendants' argument is unpersuasive. Tabet testified that he had one conversation with Hussain and that that conversation occurred around May, when Hussain learned that Tabet was leaving. Tabet and Cosmo. Resp. SOF at ¶ 53; *id.* at Ex. B, Tabet Dep., at 188:11-191:5. Accordingly, Defendants and Plaintiffs' accounts of that conversation are in dispute.

Gvozden also objects to Defendants' account of the conversation between Tabet and Hussain, as it is based on Hussain's testimony, which they argue is inadmissible hearsay. In response, Defendants argue that Hussain's testimony is admissible under Fed. R. Evid. 804(b)(1). The Court need not resolve the admissibility of his testimony at this time. Even assuming his testimony is admissible, it is disputed.

## C.  The Managerial Transition

The parties also dispute the timing of Tabet's decision to work for Cosmopolitan. Defendants contend that Tabet started planning his transition while he still worked at Mill Run. In support of this contention, they point to his involvement with Cosmopolitan's lease and bank account as well as his job offer to Hussain.  According to Tabet and Cosmopolitan, however, Tabet only decided to join Cosmopolitan around the time of his resignation based on the following undisputed facts.  Around June 2006, Tabet informed Cosmopolitan employee Michalis Tsakos that he was leaving Mill Run and planned to return to his home country of Lebanon.  Tabet and Cosmo. SOF at ¶ 37.  Tsakos told Tabet that if he decided to return, he would have a job waiting for him at Cosmopolitan.  *Id.*  Subsequent conflict in Lebanon foiled Tabet's plan to go home.  *Id.* at ¶ 38.  Only then did Tabet begin working at Cosmopolitan.  *See id.* at ¶¶ 37-39.

On June 1, 2006, Defendant Daher replaced Tabet as Mill Run's manager at Tabet's recommendation.  *Id.* at ¶ 71.  Daher subsequently discovered a box containing invoices from the previous several months.  *Id.*  at ¶ 74.  The invoices, all of which were labeled, "attention Merima [Gvozden] or attention Nagi [Tabet]," showed orders for Croatia Air tickets from Cosmopolitan.  *Id.* at ¶¶ 74, 78.  Daher checked Mill Run's database to see if he could find a corresponding record.  *Id.* at ¶ 76.  Unable to find any matching record, he sent the documents to Mill Run's corporate office at the request of Defendant Akiki, the controller at that office.  *Id.* at ¶¶ 75-76.  Mill Run subsequently went through its entire database and could not find a single matching ticket in its stock. *Id.* at ¶¶ 78.  Defendants suggest that all of this was a surprise to Mill Run and that it had no prior knowledge of the Croatia Air sales.  Tabet, however, testified that he had informed Daher about the Croatia Air purchases earlier on Daher's first day of work, *see*

Tabet and Cosmo. SOF at ¶ 25, suggesting that Mill Run should have been unsurprised to find the invoices.

Around this time, Defendants also learned about a group of fifteen Iberia Air reservations that Tabet previously sold in coordination with Cosmopolitan. This group began as customers of Cosmopolitan, but later switched from Cosmopolitan to Mill Run. *Id.* at ¶ 86. By the time they switched, Cosmopolitan already had booked tickets on their behalf. *Id.* Post-switch, the airline refused to make a second set of reservations. *Id.* Tabet could not otherwise obtain tickets for the group, so he contacted Cosmopolitan and proposed that he purchase Cosmopolitan seats and that the two consolidators split the commission 50-50. Tabet and Cosmo. SOF at ¶ 27.

On June 16, 2006, after Tabet's departure, Yvonne Eid of Mill Run's corporate office received a commission check from Cosmopolitan for an Iberia reservation without any accompanying travel information. Defs. SOF at ¶ 87. Unable to find any record of that transaction, Eid called Carlo D'Allesandro at Cosmopolitan. *Id.* at ¶ 89. D'Allesandro told Eid that Mill Run's Chicago office had purchased the tickets and gave her a list of corresponding ticket numbers. *Id.* at ¶ 90. The ticket numbers did not match Mill Run's records. *Id.* Eid again contacted D'Allesandro, asking him what else Cosmopolitan had done with Mill Run Chicago. *Id.* at ¶ 91. He faxed her a 15-person released Iberia reservation, stating that that order was all that Cosmopolitan had done with Mill Run Chicago. *Id.* His statement was false, as Tabet had sent D'Allesandro payment for the Croatia Air tickets over the previous six months. *Id.* at ¶ 92. Defendants contend that these undisputed facts—particularly D'Allesandro's inaccurate statement—indicate an attempt to hide the Croatia Air sales. Tabet's testimony, however, paints a different picture. He contends that he himself told Daher about the reservations during Daher's

training, providing him with the relevant documentation. Tabet and Cosmo. SOF at ¶ 29; Tabet and Cosmo. Resp. SOFs at ¶ 85.

### D.     M&M Sales

Following Tabet's departure to Cosmopolitan, Defendants became aware of another group of sales that allegedly benefited Plaintiffs at Mill Run's expense. These sales emerged from a conversation between Gvozden and Tabet during 2004 when Gvozden expressed a need for more income. Defs. SOF at ¶ 95. To make more money, Gvozden asked Tabet if her husband's company, M&M, could purchase tickets from Mill Run as a travel agency. *Id.* at ¶ 96. Generally, a travel agency must first be approved by Mill Run before it can purchase tickets from it. Tabet and Cosmo. SOF at ¶ 6. Starting in the early 2000s, M&M had performed janitorial services, painting, remodeling, and construction, but not travel services. Defs. SOF at ¶ 97. Mill Run's criteria for approving a travel agency are minimal; they require letterhead, a tax ID number, an office, and a name. *Id.* at ¶ 7. Tabet first told Gvozden that he had to check with the head office to see if the arrangement would be acceptable. Pltfs.' Resp. SOFs at ¶ 95. He subsequently authorized M&M's registration as a travel agency with Mill Run, *id.* at ¶ 96, after which M&M began booking flights for passengers, including Gvozden's friends, and buying tickets from Mill Run.[5] M&M received a commission for these sales—one that was no higher than what other travel agencies received. Gvozden SOF at ¶ 19. M&M was not Mill Run's only travel agency run by a Mill Run employee. *Id.* at ¶ 4. A number of other Mill Run employees previously operated their own travel agencies on the side. *Id.* For example, Daher himself had

---

[5] In their statement of facts, Defendants suggest that M&M sold tickets not only to individual customers but also to travel agency customers. See Defs. SOF at ¶ 99 ("In these Chicago M&M sales, Mill Run received less than the full amount that Mill Run's *travel agency customer* paid for its tickets, with Chicago M&M retaining the remainder of Mill Run's *travel agency customer*'s payment as a commission.") (emphasis added). As Tabet and Cosmopolitan point out, the cited deposition testimony does not support a factual assertion that M&M sold customers to other travel agencies, as opposed to individual customers. See Defs. SOF, Gvozden Dep., Ex. 16 at 140:14-142:9.

an agency called Hawaii Travel.  *Id.*  He previously asked Gvozden to cause Mill Run to sell tickets to Hawaii Travel.  *Id.*

### E. Government Investigation

After learning about both the M&M and Croatia Air sales, Mill Run contacted Cook County Assistant State's Attorney Karyn Stratton in 2007.  Defs. SOF at ¶ 101.  Stratton met with Mill Run representatives, including Defendant Azzi, a manager at Mill Run's corporate office in New York.  *Id.* at ¶ 102.  The Mill Run representatives told Stratton that that they believed Plaintiffs had committed a crime.  Tabet and Cosmo. SOF at ¶ 42.  They told her about the Croatia Air sales, stating that they had no prior knowledge of these sales; that the sales did not appear on the databases; that Mill Run had received no commissions from them; and that after arranging these sales with Cosmopolitan, Tabet left Mill Run to work at Cosmopolitan.  Defs. SOF at ¶ 104.  Mill Run's representatives explained how their business worked, and Azzi explained the technical issues related to the ticket transactions.  *Id.*  Notably, Mill Run failed to inform Stratton that if Tabet or Gvozden had sold Croatia Air tickets through Lufthansa or United instead of Cosmopolitan, the tickets would have cost more.  See Tabet and Cosmo. Resp. SOF at ¶¶ 102, 105; Tabet and Cosmo.'s Add. SOF  at ¶ 51; Tabet and Cosmo.'s Add. SOF, Ex. G, Azzi Dep., [209-8] at 108:23-109:1 ("Q:  So you didn't explain to her the effect that if they bought it from you, the travel agent and the traveler would have to pay more?  A:  No.  No I didn't.").  Azzi testified that he omitted this information because "it's to our benefit to sell the product that we have other than selling the product that others have.  So I didn't explain to her the effect of that because I didn't see any effect."  Defs. Reply SOF at ¶ 102.  Stratton testified that she does not remember when or from whom she later learned this information—whether it was Tabet or someone from Mill Run and whether it was before or during trial.  Tabet and

Cosmo. SOF at ¶ 51; see also Tabet and Cosmo.'s Add. SOF, Ex. H, Stratton Dep., [209-36] at 129:7-132:6, 202:16-203:3.

Mill Run subsequently sent Stratton the ticket orders and computer printouts that Daher had found. Defs. SOF at ¶ 107. Stratton then asked a grand jury to issue subpoenas on the matter. *Id.* at ¶ 108. The documents that she received in response included checks and tickets issued by Cosmopolitan. *Id.* As a result of the initial grand jury subpoena returns, Stratton sent a grand jury subpoena to Cosmopolitan, requesting all information relating to all tickets ordered by Mill Run through Cosmopolitan. *Id.* at ¶¶ 110, 111. Cosmopolitan provided very little documentation in response and stated that it had only one order of about 21 tickets. *Id.* at ¶¶ 110-112. Stratton then subpoenaed a copy of Cosmopolitan's Chicago lease. *Id.* at ¶ 113. The lease listed Tabet as a contact person, indicating to Stratton that Tabet's relationship with Cosmopolitan began earlier than his departure from Mill Run. *Id.* Based on the combination of Cosmopolitan's sparse response and the Cosmopolitan lease, Stratton believed a crime had been committed. *Id.* at ¶¶ 113, 114.

Stratton then interviewed Plaintiffs on June 18, 2008 and determined that she was going to charge or have them charged with theft and wire fraud. *Id.* at ¶ 116. Daher filed criminal complaints against both Plaintiffs that same day, and the criminal complaints note felony approval from Stratton. Defs. SOF, Ex. 37 (criminal complaints). Plaintiffs were arrested that same day. *Id.* at ¶ 117. A grand jury subsequently indicted Plaintiffs for theft as to the Croatia Air/Iberia Air and M&M sales and wire fraud as to the M&M sales.[6] *Id.*

---

[6] The Court assumes that the theft count was based on the Croatia Air/Iberia and M&M sales and that the wire fraud was based only on the M&M sales based on (1) Defendants' characterization of the charges in their summary judgment brief, see Defs. MSJ at 8-9, which Plaintiffs do not contest; (2) Stratton's deposition testimony that the theft charges were based on the Croatia Air and M&M sales, see Defs. SOF, Ex. 36, Stratton Dep., at 92:13-18; and (3) the criminal complaints, Defs. Ex. 37, which indicate that the wire fraud claims arose from the M&M sales.

At the bench trial in May 2010, the court granted a motion for a directed verdict on the wire fraud counts after the government's case in chief, finding that the wire fraud counts were predicated on a fact insufficiently supported by the government's evidence: that M&M was not a travel agency. Gvozden, Resp. SOF, Ex. 3, Trial Transcript, at 98-99. At the close of trial, the court found Tabet and Gvozden not guilty of theft, reasoning that it was unclear whether Mill Run suffered a loss and, if so, whether it was an actual economic loss or a loss of economic opportunity. *Id.* at 168-176.

Both Plaintiffs have sued all four moving Defendants for false arrest (Counts I), malicious prosecution (Counts II), and intentional infliction of emotional distress (Counts III). Tabet has also sued Mill Run for breach of contract (Count V) and both Mill Run and Akiki for conversion/theft (Count VI). As to the breach of contract claim, Tabet alleges that Mill Run failed to compensate him for unused vacation time and to pay him his salary from January to May of 2006. As to the conversion/theft claim, Tabet contends that Akiki confiscated $13,900 from Tabet's drawer at Mill Run in approximately 2002 or 2003. Tabet also alleges that Mill Run is liable for the conduct of its employees under a theory of *respondeat superior* (Count VIII). Defendants move for summary judgment on all of these claims.

Defendants have filed several counterclaims and third-party claims, among them a breach of fiduciary duty against Tabet and Gvozden (Count I); intentional interference with prospective business against Tabet, Gvozden, and Cosmopolitan (Count III); fraudulent concealment against Tabet (Count IV); conspiracy against Tabet, Gvozden, and Cosmopolitan in relation to the Croatia Air ticket sales (Count VI); and conspiracy against Tabet and Gvozden in relation to the M&M ticket sales (Count VII). Defendants move for summary judgment on these counterclaims/third-party claims.

## II.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    False Arrest and Malicious Prosecution Claims
### (Counts I and II of Tabet and Gvozden Complaints)

Defendants move for summary judgment on Plaintiffs' false arrest and malicious prosecution claims, arguing that there was probable cause to arrest and prosecute Plaintiffs. To prevail on a claim of false arrest, a plaintiff must show that she was "unreasonably restrained without probable cause." *Ross v. Mauro Chevrolet*, 861 N.E. 2d 313, 317 (Ill. App. Ct. 2006). To prevail on a claim of malicious prosecution, a plaintiff must show that (1) the defendant brought the underlying suit maliciously and without probable cause; (2) the former action was terminated in his or her favor; and (3) that the plaintiff suffered special damages beyond the usual expense, time or annoyance of defending a lawsuit. See *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015); *Cult Awareness Network v. Church of Scientology Int'l*, 685 N.E.2d 1347, 1350 (Ill. 1997). Thus, probable cause defeats claims of both false arrest and malicious prosecution.

Probable cause is defined as "'a state of facts that would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested committed the offense charged.'" *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 863 (7th Cir. 2010) (quoting *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 319 (Ill. App. Ct. 2006)). When a court examines probable cause, "'[i]t is the state of mind of the person [making the arrest or] commencing the prosecution that is at issue—not the actual facts of the case or the guilt or innocence of the accused.'" *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013) (quoting *Sang Ken Kim v. City of Chicago*, 858 N.E. 2d 569, 574 (Ill. App. Ct. 2006)).

Because Plaintiffs bring both false arrest and malicious prosecution claims, the question is whether probable cause existed at two moments: first, the time of arrest, and, second, the

commencement of the criminal proceedings. In this case, the two moments fell on the same day—June 18, 2008—when Plaintiffs were arrested and when Daher filed the complaint. Defendants argue that probable cause existed then because the "present facts and circumstances are sufficient to warrant a prudent person in believing that the suspect had committed an offense." MSJ at 12. They cite numerous inculpatory facts developed during the discovery for this action in support of their contention. This argument misapprehends the applicable standard. As explained above, probable cause does not turn on subsequently discovered facts going to actual innocence or guilt. See *Rodgers*, 315 Ill. App. 3d at 348. Put differently, it does not depend on the "*present* facts and circumstances." MSJ at 12 (emphasis added). Rather, it turns on the evidence available to the government when the arrest occurred and the criminal proceedings commenced. *Id.* If a reasonable person viewing the evidence then would believe that Plaintiffs had committed theft and wire fraud, then probable cause existed as to both crimes.

Critical to what a reasonable person would have thought based on the evidence available at the time is a rule that the parties hardly have addressed: "'Prima facie probable cause' is established by the return of the indictment by the grand jury but it is not conclusive evidence of probable cause. It may be rebutted by other evidence such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury, or by failing to make a full or complete statement of facts, or by other improper or fraudulent means." *Freides v. Sani-Mode Mfg. Co.*, 211 N.E. 2d 286, 289 (Ill. 1965). Put differently, a court presumes that a reasonable person would have found probable cause where presumptively reasonable grand jurors actually did find probable cause. A plaintiff may then rebut this presumption by showing that their decision-making process was somehow tainted.

Here, the grand jury indicted Plaintiffs for theft and wire fraud, creating prima facie probable cause as to both crimes. The question, therefore, is whether Plaintiffs have offered evidence rebutting this presumption of probable cause. Without explicitly acknowledging the effect of a grand jury indictment on the Court's probable cause analysis, Plaintiffs effectively do argue that the grand jury indictments were obtained by Mill Run's failure to make "make a full or complete statement of facts" about the Croatia Air sales. *Id.* Specifically, they argue that Mill Run failed to inform Stratton that, had Gvozden and Tabet sold the Croatia Air tickets through Lufthansa or United rather than Cosmopolitan, the tickets would have been more expensive; customers therefore may have declined to purchase the tickets, and some may have even left Mill Run for an alternative consolidator. They contend that Gvozden's and Tabet's Croatia Air sales therefore created value. Based on Azzi and Stratton's deposition testimony, a reasonable fact-finder could agree.

Even so, Plaintiffs' argument does not address the government's theory of wire fraud and their alternative theory of theft: the M&M sales. Plaintiffs do not point to any evidence that, to the extent that the indictments were rooted in the M&M sales, they were obtained by "false or fraudulent testimony," by an "[in]complete statement of facts, or by other improper or fraudulent means." *Id.* Rather, Plaintiffs generally argue that probable cause did not exist because M&M satisfied the minimal requirements for registering as a travel agency; because travel agencies were customers, not competitors of Mill Run; and because M&M received the same commission that any other travel agency would have received. Gvozden's Resp. MSJ at 10-11; Tabet and Cosmo.'s Resp. MSJ at 8-10. These arguments miss the mark. Because of the grand jury indictments, Plaintiffs must do more than point to generally exculpatory facts. They must offer evidence specifically showing the grand jury decision-making process was tainted by "false or

fraudulent testimony," a failure to make a "full or complete statement of facts," or "other improper or fraudulent means." *Id.* Because they have not done so, the Court grants Defendants' motions as to the false arrest and malicious prosecution claims.

Defendants are entitled to summary judgment for a second reason: even assuming that Mill Run misled Stratton by failing to explain the price differential, her subsequent year-long independent investigation superseded their contribution to the investigation and prosecution. To be liable for malicious prosecution, a private party must have commenced a criminal proceeding. *Szczesniak v. CJC Auto Parts, Inc.*, 21 N.E. 3d 486, 491 (Ill. App. Ct. 2015). A party is deemed to have commenced a criminal proceeding if it knowingly gives false information to law enforcement. However, "[e]ven if an informer knowingly provides false information, he or she is not liable for 'commencing' a criminal proceeding if the prosecution is based upon separate or independently developed information." *Id.* (finding that even if a defendant lied to the police, his statement "was superseded and rendered immaterial by the independent investigations of two different police officers who developed sufficient evidence to seek plaintiff's arrest and prosecution."); see also *Randall v. Lemke*, 726 N.E. 2d 183, 186 (Ill. App. Ct. 2000). Here, it is undisputed that Stratton's year-long investigation included more than just information from Defendants. It also consisted of responses to grand jury subpoenas and, significantly, Stratton's interviews with Plaintiffs themselves. Accordingly, to the extent that Defendants misinformed Stratton, her independent investigation supersedes their misinformation and renders it immaterial. Lastly, although the independent investigation defense usually appears in the malicious prosecution context, the analysis is applicable to the false arrest claim because the arrest occurred the same day that the criminal proceedings commenced.

**B.    Intentional Infliction of Emotional Distress (Counts III)**

Defendants also move for summary judgment on Plaintiffs' claims of intentional infliction of emotional distress (IIED).  To prevail on an IIED claim, a plaintiff must show that "(1) the conduct was truly extreme and outrageous; (2) the actor either intended that his conduct inflict severe emotional distress, or knew that there was a high probability that the conduct would cause severe emotional distress; and (3) the conduct, in fact, caused severe emotional distress." *Reilly ex rel. Reilly v. Wyeth*, 876 N.E. 2d 740, 755 (Ill. App. Ct. 2007).  Plaintiffs claim that Defendants intentionally inflicted emotional distress on them by causing their arrest and prosecution.  Defendants move for summary judgment, arguing that Plaintiffs lack evidence of the first and second requirements.

Beginning with the first requirement, whether conduct is "'extreme and outrageous' is evaluated objectively based on all of the facts and circumstances.  The nature of a defendant's conduct must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community."    *Id.* (citations and internal quotation marks omitted). "Conduct is of an extreme and outrageous character where recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  *Doe v. Calumet City*, 641 N.E. 2d 498, 507 (Ill. 1994) (citation and internal quotation marks omitted).  Thus, to the extent that the IIED inquiry turns on "all of the facts and circumstances," *id.*, the analysis here is distinct from the false arrest and malicious prosecution analysis, which only turned on the facts available to the police, Stratton, and the grand jury at the time of the arrest and the commencement of the criminal proceedings.

Although the standard is high, a reasonable jury could find that Defendants committed extreme and outrageous behavior by reporting Plaintiffs to Stratton, participating in an extensive

investigation against them, signing a complaint, and testifying against Plaintiffs at trial. It could find these acts extreme and outrageous in light of the following five facts, all of which a jury could decide by resolving factual disputes in Plaintiffs' favor: (1) Plaintiffs had no reason to believe that Mill Run would oppose the Croatia Air and M&M sales, (2) Plaintiffs intended for the sales to benefit Mill Run, (3) the sales actually did benefit Mill Run, (4) Defendants would have understood this, given their knowledge of the industry and Mill Run, and (5) Defendants consequently would have known that charges of theft or wire fraud would be baseless.

Explained in more detail, a jury resolving factual disputes in Plaintiffs' favor could find the following: Mill Run customers demanded Croatia Air tickets, so Tabet asked the corporate office to create a direct contract with Croatia Air. The corporate office expressed disinterest in creating a direct contract and left Tabet with general instructions to "[s]ee what you want to do." Tabet and Cosmo.'s Add. SOF at ¶ 11. Around this time, two customers suggested that they might leave Mill Run for another consolidator if Mill Run did not start offering Croatia Air tickets. So Tabet decided to figure out a way to sell Croatia Air tickets in the absence of a direct contract.

Offering tickets via Lufthansa or United made little financial sense, as it would have increased the fare by $200, creating an uncompetitive price. And directly purchasing tickets from Cosmopolitan (rather than booking and releasing them to Cosmopolitan) offered no profit while potentially connecting customers with Cosmopolitan and risking customer defection. So Tabet instituted the book-and-release method with Gvozden's assistance.

A rational trier of fact could conclude that Tabet had no reason to believe that Mill Run would oppose this method for several reasons. First, it had always given Tabet broad discretion to manage the Chicago office. Second, it had offered tickets issued by other consolidators in the

past. And, third, the corporate office had provided no instructions except a general instruction to "[s]ee what you want to do." Tabet and Cosmo.'s Add. SOF at ¶ 11. So he and Gvozden began the book-and-release process.

In carrying out these bookings and releases, Tabet aimed to and did actually minimize the risk of diverting customers to Cosmopolitan (after all, the whole point of the sales was to retain customers). Specifically, he and Gvozden attempted to reduce the risk of customer defection in three ways. First, Tabet intentionally withheld customers' contact information from Cosmopolitan, as evidenced by Cosmopolitan's accounting, which lists Mill Run as the vendor/client, not the travel agencies. Second, Tabet and Gvozden used partial releases rather than full releases, which allowed Gvozden rather than Cosmopolitan to control the customer-interactions moving forward. Third, Tabet created his own invoices, omitting Cosmopolitan's information to prevent customers from contacting Cosmopolitan. Because the sales resulted in no profit, Tabet didn't bother entering them into the database. Thus, the Croatia Air sales helped Mill Run by expanding its product line, thereby retaining customers interested in a broader selection without diverting customers to Cosmopolitan.

A reasonable jury also might reject Defendants' suggestion that Tabet arranged the Croatia Air sales as part of a larger plan to help his future employer, Cosmopolitan. Defendants' contention turns on the assumption that Tabet began planning his departure to Cosmopolitan months before his resignation. A reasonable jury could reject this premise, finding that, although Tabet may have decided to leave Mill Run months before his official resignation, he did not contemplate going to Cosmopolitan until his conversation with Tsakos in June 2006, when conflict in Lebanon foiled his plan to go home.

As to the M&M tickets, a reasonable jury could find the following:  M&M was properly authorized to purchase Mill Run tickets for two reasons.  First, Mill Run had minimal criteria for approving travel agencies, which M&M satisfied.  Second, Mill Run had no rule prohibiting employees from creating travel agencies, and it had no rule prohibiting the sale of tickets to such agencies.  In fact, Mill Run previously sold tickets to employee-run travel agencies, including one run by Daher himself.  Accordingly, M&M was properly authorized to purchase tickets from Mill Run.

A reasonable jury also could find that the M&M sales benefited Mill Run because Mill Run paid M&M no more than it paid every other travel agency, and it benefited by selling tickets to Gvozden's friends.  Defendants emphasize that Mill Run experienced a loss because it received less than what M&M's customers paid.  A reasonable jury could reject this argument, finding that M&M caused Mill Run to receive more than it otherwise would for two reasons.  First, Mill Run was a wholesaler, not a retailer.  It did not sell directly to end-users.  It sold tickets to travel agencies and paid them a commission.  Payment of a commission was a necessary and expected loss inherent in the sale of it tickets.  Second, a reasonable jury could find that M&M increased Mill Run's sales by adding Gvozden's friends as new (indirect) customers.

Lastly, a reasonable jury could find that Tabet was forthcoming with Daher about the Croatia Air, Iberia Air, and M&M sales during the managerial transition.  It also could find that to the extent D'Allessandro lied about the Croatia Air sales and to the extent that his lie suggested that he thought the sales were wrongful, his belief was simply mistaken.

If a jury found these facts by resolving all disputes in Plaintiffs' favor, it could reasonably conclude that Defendants would have known, first, that the Croatia Air and M&M sales helped

Mill Run and, second, that Tabet and Gvozden had no reason to believe that Mill Run would have disapproved of them. From there, a jury could reason that Defendants would have known that the criminal charges were baseless and that their role in the prosecution therefore was outrageous.

Defendants argue that "conduct which resulted in a person's arrest, and subsequent refusal to drop charges, does not amount to extreme or outrageous conduct sufficient to support a claim for intentional infliction of emotional distress" as a matter of law. MSJ at 18, citing *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935 (Ill. App. Ct. 1997) for support. *Adams* involved a private party who filed a criminal complaint, learned exculpatory information about the criminal defendant, and then failed to withdraw the complaint. The Illinois Appellate Court found that the failure to withdraw the complaint was neither extreme nor outrageous because once he signed the complaint, he could no longer withdraw it, and control over the prosecution lied solely with the state's attorney. *Id.* at 40. Moreover, "any omission in failing to inform the prosecutor of newly discovered information relevant to the criminal action set in motion would arguably, at best, constitute passive conduct that by its very nature could not rise to the level of outrageous conduct." *Id.* The facts here are distinguishable. Plaintiffs do not allege that Defendants failed to act on exculpatory information after filing the complaint, or that they passively failed to update the government. They allege that from the moment Defendants first reported Plaintiffs to the moment they testified against them at trial, they knew that their accusations were baseless. Accordingly, the Court is unpersuaded that, under *Adams*, Defendants conduct could not have been extreme or outrageous as a matter of law.

As to the second requirement, a reasonable fact-finder also could infer that Defendants intended the criminal prosecutions to cause severe emotional distress or that they knew there was

a high probability that the prosecutions would cause severe emotional distress. See *Reilly*, 876 N.E. 2d at 755. By all accounts, the relationships between Plaintiffs and Defendants took a negative turn when Tabet left Mill Run for Cosmopolitan, followed by several Mill Run employees. A reasonable fact-finder viewing these damaged relationships and believing that the charges were baseless could infer that Defendants had a retaliatory motive when they reported Plaintiffs to the police, and that they intended to cause emotional distress. Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiffs' IIED claims.

### C.  Breach of Contract (Count V of Tabet Complaint)

Defendants move for summary judgment on Tabet's breach of contract claim. The elements of a breach of contract claim are "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Vill. of S. Elgin v. Waste Mgmt. of Illinois, Inc.*, 810 N.E. 2d 658, 669 (Ill. App. Ct. 2004). Defendants move for summary judgment, arguing that Tabet fails to satisfy the fourth requirement. They do not articulate or provide any evidence of the required conditions that they contend he violated. Instead, they argue generally that his involvement in the Croatia Air and M&M sales, Cosmopolitan's lease and bank account, and the alleged recruitment of Hussain were "wholly improper for a company's branch manager" and "hardly amount to the performance of 'all required conditions' of Tabet's employment." MSJ at 19. As to the Croatia Air sales and the M&M sales, a reasonable jury could find otherwise for the reasons explained above. See *supra* part III. B. As to the lease, the bank account, and the recruitment, Defendants have insufficiently articulated what employment conditions these acts violated and how. Rule 56 places the burden on the moving party to demonstrate why it is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Defendants fail to satisfy this burden as to this count.

### D.    Conversion (Count VI of Tabet Complaint)

Tabet has withdrawn his claim of conversion.  Tabet Resp. to MSJ at 14.  Defendants' motion as to this count therefore is moot.

### E.    *Respondeat Superior* (Count VIII of Tabet Complaint)

Defendants move to dismiss Count VIII of Tabet's Complaint, which alleges that Mill Run is liable for the acts of its employees under a theory of *respondeat superior*.  They argue that *respondeat superior* is a theory of vicarious liability, not an independent cause of action, and that because they are entitled to summary judgment with respect to the underlying claims against the individual employees, Mill Run cannot be vicariously liable as a matter of law.  Because the Court declines to grant summary judgment as to all of the underlying claims against the individual Defendants, it remains possible for a jury to find Mill Run vicariously liable. Accordingly, the Court denies Defendants' motion as to this count.

### F.    Breach of Fiduciary Duty (Count I of Counterclaim/Third-Party Claim)

Defendants also move for summary judgment on their breach of fiduciary counterclaim against Tabet and Gvozden.  Defendants allege that Tabet breached his fiduciary duties toward Mill Run by carrying out the Croatia Air and M&M sales; by helping Cosmopolitan obtain a lease and open a bank account; and by offering a job to Hussain.  They allege that Gvozden also breached her fiduciary duties in carrying out the Croatia Air and M&M sales.

The Court denies Defendants motion, as they have insufficiently briefed what substantive law applies, what it requires, and how it applies to the facts.  Defendants motion for summary judgment cites only two cases, and the reply brief cites no law at all.  Both cases cite only Illinois

law (as do Plaintiffs' arguments). Case law, however, suggests that New York law applies, as Mill Run is incorporated in that state. "As a general matter, the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation." *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983); accord *Lincoln Sav. & Loan*, 749 F.2d 374, 377 (7th Cir. 1984); see also *Gunter v. Novopharm USA, Inc.*, 2001 WL 199829, at *7 (N.D. Ill. Feb. 28, 2001) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders.") (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)). The difference in law may be material. Illinois' "'preliminary stages' doctrine permits an employee to plan, form, and outfit a competing corporation while still working for the employer, as long as he does not commence competition." *Exhibit Works, Inc. v. Inspired Exhibits, Inc.*, 2005 WL 3527254, at *5 (N.D. Ill. Dec. 21, 2005). In New York, an employee "may create a competing business prior to leaving his employer without breaching any fiduciary duty unless he makes improper use of the employer's time, facilities or proprietary secrets in doing so." *Schneider Leasing Plus, Inc. v. Stallone*, 569 N.Y.S.2d 126, 128 (N.Y. App. Div. 1991). As the moving parties, Defendants have the burden of demonstrating that there are no genuine disputes of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Because they have insufficiently briefed the applicable law, Defendants fail to satisfy this burden.[7]

---

[7] Should the litigation proceed, the parties may wish also to address whether the fiduciary duties of an employee differ from those of an officer and, if so, whether Tabet falls in the first category or both

Moreover, to the extent that they allege a fiduciary breach premised on the Croatia Air and M&M sales, Defendants are not entitled to judgment as a matter of law because there are material disputes of fact going to whether the sales were authorized, whether they were intended to help or hurt Mill Run, and whether they actually helped or hurt Mill Run. See *supra* part III. B. To the extent that Defendants allege a fiduciary breach premised on the Iberia Air sales, the Court also denies their motion. The undisputed facts indicate that by the time the Iberia Air passengers left Cosmopolitan for Mill Run, Cosmopolitan had already booked the tickets. The airline refused to make a second set of reservations, so Tabet proposed that Mill Run buy Cosmopolitan's reservations and that the two split the commission 50-50. A reasonable jury could find that this arrangement benefited Mill Run, allowing Mill Run to offer the customers what it could not offer in the absence of Cosmopolitan's cooperation.

### G. Intentional Interference with Prospective Business (Count III of Counterclaim/Third-Party Claim)

Defendants move for summary judgment on their counterclaim/third-party claim of intentional interference with prospective business against Tabet, Gvozden, and Cosmopolitan (Count III). To prevail on this count, Defendants "must establish (1) a reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of the expectation, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damage to the plaintiff resulting from the defendant's interference." *Atanus v. Am. Airlines, Inc.*, 932 N.E.2d 1044, 1048 (Ill. App. Ct. 2010).

Defendants contend that Tabet, Gvozden, and Cosmopolitan purposefully interfered with Mill Run's expectancy in its continued relationships with its customers. A reasonable jury could

categories.

conclude otherwise, finding that Tabet and Gvozden proactively sought to prevent customer diversion through (1) Tabet's invoicing system, which omitted Cosmopolitan's information, (2) Gvozden's use of partial rather than full releases, and (3) Tabet's non-disclosure of customer information from Cosmopolitan—three facts that would negate the third and fourth elements of the claim. It could also find that, if anything, the book-and-release system retained customers by expanding Mill Run's product line—again a fact that negates the fourth element. For the same reasons, a jury could find that Cosmopolitan also committed no tortious interference with business expectancy. Accordingly, the Court denies summary judgment as to this count.

### H. Fraudulent Concealment (Counts IV of Counterclaim/Third-Party Claim)

Defendants move for summary judgment on their counterclaim of fraudulent concealment against Tabet (Count IV). To prevail on a claim of fraudulent concealment, Defendants must prove the elements of fraudulent misrepresentation, which include "(1) a false statement or omission of material fact; (2) knowledge or belief of the falsity by the party making it; (3) intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance." *Weidner v. Karlin*, 932 N.E. 2d 602, 605 (Ill. App. Ct. 2010). Defendants additionally must prove that Plaintiffs "intentionally omitted or concealed a material fact that [they were] under a duty to disclose" to Defendants. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012). This duty would exist "if 'plaintiff and defendant are in a fiduciary or confidential relationship' or in a 'situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff.'" *Id.* (quoting *Connick v. Suzuki Motor Co.*, 675 N.E. 2d 584, 593 (Ill. 1996)).

Defendants contend that, as Mill Run's manager, Tabet had a duty to disclose his release of tickets to Cosmopolitan, his recruitment of Hussain, and his involvement in Cosmopolitan's lease and bank account. As to the Croatia Air tickets, again, a reasonable jury resolving factual disputes in Plaintiffs' favor could find that they helped rather than hurt Mill Run, precluding a claim of fraudulent concealment. See *supra* part III. B. As to the alleged recruitment of Hussain, a reasonable jury could find that Tabet never asked Hussain to come join him at Cosmopolitan; rather, *Hussein* approached Tabet asking for a job, at which point Tabet discouraged him from leaving Mill Run for visa purposes. As to the lease and the bank account, Defendants have demonstrated that Tabet helped Cosmopolitan obtain a lease and bank account without disclosing this information to Mill Run, facts relevant to the first and second elements. However, they have not articulated sufficiently how the evidence surrounding the lease and bank account shows "(3) intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance." *Weidner v. Karlin*, 932 N.E. 2d 602, 605 (Ill. App. Ct. 2010). Accordingly, the Court denies Defendants' motion with respect to these counts.

## I.     Conspiracy (Count VI and VII of Counterclaim)

Defendants move for summary judgment on Counts VI and VII, both of which allege conspiracy. Count VI alleges that Tabet, Gvozden, and Cosmopolitan conspired to release Mill Run orders to Cosmopolitan. Count VII alleges that Tabet and Gvozden conspired with M&M (not a named Defendant) to take orders from Mill Run's clients, book them through Mill Run's computer system, and list M&M as the travel agent, even though M&M was a maintenance and management company.

The elements of a civil conspiracy are: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E. 2d 461, 470 (Ill. 2004). The Court denies Defendants' motion as to both conspiracy counts, as there are disputed issues of fact going to the second element. Defendants contend that the Croatia Air, Iberia Air, and M&M sales constituted an unlawful purpose or unlawful means of accomplishing a lawful purpose. But, again, a reasonable jury could find that Plaintiffs intended for these sales to help Mill Run, that they did help Mill Run, and that Tabet and Gvozden had no reason to believe that Mill Run would have disapproved of them. See *supra* parts III. B&F. A reasonable jury finding these facts could return a verdict for Plaintiffs and Cosmopolitan on these counts.[8] Accordingly, the Court denies Defendants' motion as to both counts.

IV.     **Conclusion**

For the foregoing reasons, the Court grants Defendants' motion as to Counts I and II of Tabet and Gvozden's complaints. It denies as to Counts III of both complaints, Counts V, VI, and VIII of Tabet's complaint, and Counts I, III, IV, VI, and VII of Defendants' third-party claim/counterclaim.

Dated: August 5, 2015

_____
Robert M. Dow, Jr.
United States District Judge

---

[8] Moreover, to the extent that Count VI suggests that Tabet and Cosmopolitan employed unlawful means when Tabet helped Cosmopolitan obtain a lease and a bank account, Defendants' motion is still denied. As the moving party, Defendants have the burden of articulating why these acts are unlawful. As explained above, Defendants allege that they constitute a breach of fiduciary duty, but they insufficiently articulate what specific duties applied and how Plaintiffs breached those duties. Accordingly, the Court denies summary judgment on Count VI to the extent that it is premised on this theory.