**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MERIMA GVOZDEN,                              )
                                            )
        Plaintiff,                   )          Case No. 10-cv-4595
                                            )
    v.                                      )          Judge Robert M. Dow, Jr.
                                            )
MILL RUN TOURS, INC., et al.,                )
                                            )
        Defendants,                  )
—————————————————————          )
                                            )
NAGI TABET,                                  )
                                            )          Case No. 10-cv-4606
        Plaintiff,                   )
                                            )          Judge Robert M. Dow, Jr.
    v.                                      )
                                            )
MILL RUN TOURS, INC., et al.,                )
                                            )
        Defendants,                  )
—————————————————————          )
                                            )
MILL RUN TOURS, INC.,                        )
                                            )
        Counter-Plaintiff/           )
        Third-Party Plaintiff,       )
                                            )
    v.                                      )
                                            )
NAGI TABET and MERIMA GVOZDEN,               )
                                            )
        Counter-Defendants,          )
                                            )
    and                                     )
                                            )
COSMOPOLITAN TRAVEL SERVICE, INC.,           )
                                            )
        Third-Party Defendant.       )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs Merima Gvozden and Nagi Tabet's joint motion [224][1] to reconsider the Court's August 5, 2015 order [222] granting summary judgment to Defendants Mill Run Tours, Inc. ("Mill Run"), Jimmy Daher ("Daher"), Pierre Azzi ("Azzi"), and Ibraham Akiki ("Akiki") on Plaintiffs' claims for false arrest and malicious prosecution. For the reasons explained below, the Court grants Plaintiffs' motion [224], vacates its prior order [222] in part, and reinstates Plaintiffs' claims for false arrest and malicious prosecution.

## I.     Background

The background of this dispute is set forth in the Court's summary judgment order [222], knowledge of which is assumed here. In that order, the Court concluded that Defendants were entitled to summary judgment on Plaintiffs' claims for false arrest and malicious prosecution for two reasons.

First, the Court concluded that Plaintiffs failed to demonstrate the absence of probable cause, which is a necessary element of claims for false arrest and malicious prosecution. The Court explained that the return by a grand jury of an indictment constituted prima facie proof of probable cause, which could be rebutted with, among other things, evidence that the indictment was obtained by failing to make a full and complete statement of the facts. The Court determined that a reasonable factfinder could find that Plaintiffs rebutted the presumption of probable cause to the extent that their indictment was based on the Croatia Air ticket sales, pointing to evidence suggesting that Defendants failed to make a full and complete statement of facts to the prosecutor. [222] at 18. Nonetheless, the Court concluded that Defendants were entitled to summary judgment on the "lack of probable cause" element because Plaintiffs failed

_____

[1] The motion was filed as document [224] in Case No. 10-cv-4595 and as document [217] in Case No. 10-cv-4606. The parties also filed identical response and reply briefs in both dockets. In this opinion, the Court will cite to the documents filed in Case No. 10-cv-4595, unless otherwise noted.

to come forth with specific evidence demonstrating that Defendants did not make a full and complete statement of facts concerning the M&M tickets sales, *id.* at 18-19, which constituted the factual predicate for the wire fraud charge and part of the theft charge, *id.* at 13 n.6.

Second, the Court determined that there were no disputed issues of material fact concerning whether Defendants "commenced" the prosecution of Plaintiffs, because even assuming that Mill Run "misled [Assistant State's Attorney ('ASA')] Stratton by failing to disclose the price differential" between Croatia Airlines tickets purchased from Metropolitan versus tickets purchased from another carrier, ASA Stratton's "subsequent year-long independent investigation superseded their contribution to the investigation and prosecution." [222] at 19. Therefore, the Court held, Defendants were entitled to summary judgment on Plaintiffs' claim for malicious prosecution. *Id.* Finally, the Court concluded that Defendants were entitled to summary judgment on Plaintiffs' claim for false arrest on the same basis even though "the independent investigation defense usually appears in the malicious prosecution context," because the alleged false arrest and malicious prosecution commenced on the same day. *Id.*

## II.     Analysis

### A.     Probable Cause (False Arrest and Malicious Prosecution)

Upon consideration of the parties' briefs ([224], [229], [230]), the Court vacates its prior ruling that Plaintiffs failed to come forward with sufficient evidence to rebut the presumption of probable cause that was established by the grand jury's indictment for the M&M ticket sales. See [222] at 18-19. "Probable cause is a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Fabiano v. City of Palos Hills,* 784 N.E.2d 258, 266 (Ill. App. 2002). The

parties' summary judgment briefs did not address whose perception of the facts—the government's or the Defendants'—should be the focus of the probable cause analysis. In malicious prosecution cases in Illinois, "[i]t is the state of mind of the person *commencing* the prosecution that is at issue—not the actual facts of the case or the guilt or innocence of the accused." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013) (emphasis added). See, *e.g.*, *Howard v. Firmand*, 880 N.E.2d 1139 (Ill. App. 2007) (whether female former roommate had probable cause to initiate the two underlying order-of-protection proceedings against her male former roommate was a question of fact that could not be resolved on a motion for summary judgment in his lawsuit for malicious prosecution). Likewise, in false arrest cases, the probable cause analysis focuses on whether the defendant who is alleged to have procured the plaintiff's arrest had "reasonable grounds to believe that an offense was committed by the plaintiff." *Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1220 (Ill. App. 2003); see also *Driver v. Birts*, 1997 WL 790714, at *3 n.6 (N.D. Ill. Dec. 16, 1997) (explaining that where a false arrest claim is brought against private citizens who allegedly caused or procured an arrest, "the question is whether [the private citizens]—as opposed to the police officers who relied on their statements and reports—had reasonable grounds to believe that [the arrestee] committed an offense"), *aff'd*, 151 F.3d 1032 (7th Cir. 1998).

In this case, Plaintiffs' theory is that Defendants were responsible for procuring Plaintiffs' arrests and commencing and continuing criminal prosecution against them for theft and wire fraud. Therefore, the parties' and the Court's probable cause analysis should have focused on Defendants' state of mind—rather than the government's state of mind (see [222] at 17)—at the time that Plaintiffs were arrested and prosecuted. See, e.g., *Driver*, 151 F.3d 1032, 1998 WL 516782 at *2-3 (affirming grant of summary judgment for defendant on plaintiff's

4

claim against school officials for false arrest arising from plaintiff's alleged theft of equipment from school, where the undisputed facts showed that plaintiff admitted to taking home school's equipment and responded with profanity when confronted, and plaintiff's argument that there was a lack of probable cause "boil[ed] down to the charge that [defendant] did not conduct a proper investigation prior to filing criminal charges against [him]"); *Schmidt v. City of Lockport, Ill.*, 67 F. Supp. 2d 938, 947 (N.D. Ill. 1999) (denying restaurant owner's motion for summary judgment on malicious prosecution claim brought against him by restaurant patron following patron's arrest, at the direction of restaurant, for disorderly conduct, where genuine issue of material fact existed as to whether restaurant patron had been screaming and yelling during altercation in the restaurant); *Johnson*, 791 N.E.2d at 1220 (granting store's motion for summary judgment on malicious prosecution claim brought against it by former cashier who was arrested for theft, where the undisputed facts showed that store personnel had probable cause to arrest the cashier based on witnessing cashier and two coworkers ringing up merchandise for less than the price marked, security videotapes showing that activity, statements from the security personnel present at the time of the incident, and cashier's refusal to prepare a statement of her version of events); *Turner v. City of Chicago*, 415 N.E.2d 481, 485-86 (Ill. App. 1980) (granting defendant plant's motion for summary judgment on malicious prosecution claim brought against it by Turner, where the undisputed facts showed that when plant manager executed felony complaint against Turner, he had an honest belief that Turner was probably guilty of stealing copper ingots from plant based on his own observation of ingots being thrown from a window to the ground and on reports from security officers). Whether Defendants were, in fact, responsible for procuring Plaintiffs' arrest or commencing and continuing Plaintiffs' prosecution are separate questions, considered under a separate framework below.

"'Prima facie probable cause' is established by the return of the indictment by the grand jury but it is not conclusive evidence of probable cause." *Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1965) (citing 54 C.J.S. Malicious Prosecution § 35, p. 996). "It may be rebutted by other evidence such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury, or by failing to make a full or complete statement of facts, or by other improper or fraudulent means." *Id.*

Applying these standards, the Court reconsiders its ruling as to the "lack of probable cause" element of Plaintiffs' claims. The Court concludes that there are disputed issues of material fact concerning whether the indictment was obtained by Defendants' failure "to make a full or complete statement of facts" as to the Croatia Air sales, the Iberia sales, and the M&M sales. *Freides*, 211 N.E.2d at 289. As the Court previously concluded, Plaintiffs have come forth with evidence that, if believed by the jury, could establish that Mill Run failed to provide the government with a full and complete statement of facts about the Croatia Air sales, which would rebut the prima facie probable cause established by the indictment. See [222] at 18.

Although the Court determines as a matter of law whether facts amount to probable cause, the jury is responsible for determining whether the circumstances alleged to show probable cause are true. *Howard*, 880 N.E.2d at 1142 ("The existence of probable cause is a mixed question of law and fact."). Here, the jury, as trier of fact, would need to resolve, for example, whether Tabet told Daher about the Croatia Air and Iberian sales before Tabet left Mill Run, which would undermine Defendants' allegations concerning their "discovery" of Plaintiffs' alleged theft. The trier of fact also would need to resolve whether, when Tabet asked Azzi in 2006 about getting a contract with Croatia Air, Azzi told Tabet "See what you want to do" ([218] at 3) and, if so, whether Azzi meant that Tabet was authorized to obtain Croatia Air tickets in

some other manner, which would undermine Defendants' position that Tabet was doing something wrong by obtaining tickets through Cosmopolitan. More generally, the trier of fact would need to make a credibility determination as to whether Defendants believed that Plaintiffs were depriving them of any property that belonged to Mill Run, or instead believed (as Plaintiffs allege) that Tabet's arrangement with Metropolitan benefitted, or at least took nothing away from, Mill Run. There is some evidence that Defendants recognize that even small price differences may be very significant to their customers and could cost Mill Run ticket sales. Specifically, Defendants agree with Tabet that Mill Run could not put its own mark-up on Croatia Air tickets purchased from Cosmopolitan, because if the tickets were marked up "$5, or even a single dollar, as a profit for [Mill Run], [Tabet] would not have been able to sell them" to Mill Run's customers. [218] at 6. If customers left Mill Run due to their inability to obtain the cheaper Croatia Air ticket segments, Mill Run stood to lose its sales for the two overseas international ticket segments that it sold with every Croatia Air ticket (Docket 10-cv-4606, [208] at 7-8) and future business. Plaintiffs' theory is also supported by Tabet's testimony that the practice of facilitating sales through another consolidator where Mill Run did not have a contract with an airline was done "many times before on other carriers" so that Mill Run could keep its customers. [218] at 7.

The Court further concludes that Plaintiffs have come forth with evidence that, if believed by the trier of fact, could establish that Mill Run failed to make a full and complete statement of facts about the M&M sales and lacked probable cause to believe that Plaintiffs committed a crime (theft or wire fraud) by selling tickets to M&M. The criminal complaints for wire fraud, which were signed "by Det. Stewart for [Defendant] Daher" and list Daher as the complainant, asserted that Tabet and Gvozden "transmitted or caused to be transmitted to Mill

Run Tours, by electronic communication, orders for airline tickets from Chicago M&M *knowing that M&M was not a travel agency*." [209-37] at 2, 4 (emphasis added). Plaintiffs have identified facts that call into question whether Daher and Defendants had an "honest and sound suspicion" that M&M was "not a travel agency" when the complaint was signed and throughout the prosecution. *Fabiano*, 784 N.E.2d at 266. These facts, if accepted by the trier of fact, could overcome the prima facie probable cause established by the grand jury indictment and support Plaintiffs' position that Defendants acted without probable cause. Most significantly, Defendant Azzi acknowledged in his testimony at the criminal trial that the requirements for buying tickets from Mill Run as a travel agent were very minimal. Based on Azzi's testimony, Defendants admit: "The criterion Mill Run has for a potential customer to qualify as travel agency is minimal. The company requires a letter head, a tax id number, and '[y]ou have to establish an office and a name and there are some qualifications that have to be met that you have to know the business, but this is not like it has to be done. It could be—*anybody could do a travel agent*." [218] at 2 (emphasis added). There is also evidence that other Mill Run employees operated travel agencies while working for Mill Run. Daher had an agency called Hawaii Travel and "sometimes asked Gvozden to provide tickets to Lebanon for Hawaii Travel while they both were working for Mill Run." [219] at 2. M&M received the same commission for the tickets that any other travel agency would receive. [219] at 7-8. All of the foregoing indicates that Defendants are not entitled to summary judgment on the issue of whether probable cause supported Plaintiffs' arrest and prosecution.

### B. Malicious Prosecution

"In order to establish a claim of malicious prosecution, a plaintiff must demonstrate: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the

defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Szczesniak v. CJC Auto Parts*, *Inc.*, 21 N.E.3d 486, 490 (Ill. App. 2015). "Illinois law requires that, in order to commence or continue a criminal proceeding, the defendant must have initiated the criminal proceeding or 'his participation in it must have been of so active and positive a character as to amount to advice and cooperation.'" *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 922 (7th Cir. 2001) (quoting *Denton v. Allstate Ins. Co.*, 504 N.E.2d 756, 760 (Ill. App. 1987)). "Legal causation will be attributed to a private citizen" for commencing a prosecution "only if the plaintiff can demonstrate that the defendant (1) instituted the proceedings against the plaintiff; (2) knowingly made false statements to the police; or (3) requested, directed, or pressured the officer into swearing out the complaint for the plaintiff's arrest." *Id.* (citing *Geisberger v. Vella*, 379 N.E.2d 947, 949 (Ill. App. 1978)). Even where the private citizen knowingly made false statements to the police, "he or she is not liable for 'commencing' a criminal proceeding if the prosecution is based upon separate or independently developed information." *Szczesniak*, 21 N.E.3d at 491. Alternatively, a private citizen may be held liable for *continuing* a criminal proceeding "by actively encouraging the prosecution despite knowing that no probable cause existed." *Id.*

In their motion for summary judgment, Defendants argued that they could not be held responsible for "commencing" the criminal proceedings against Plaintiff because they simply provided information to the State's Attorney's Office, and ASA Stratton conducted her own investigation and decided to charge Plaintiffs. [208] at 15-16. In response, Tabet argued that a reasonable trier of fact could find that Defendants commenced the proceedings based on the fact that Defendants "met with Stratton personally and spoke with her on the phone numerous times and, by Stratton's own testimony, it was not until she met with Defendants personally a second

time after she had issued the grand jury subpoenas that she determined to charge Tabet." Docket 10-cv-4606, [206] at 11. Tabet also emphasized that Defendant Azzi "was the individual that explained the business particulars of the travel consolidator industry to ASA Stratton and, in doing, did not explain to her that purchasing Croatia Airlines tickets as part of a Lufthansa package would cost the travel agency customers more." *Id.* at 12. In addition, Gvozden argued that Defendants were responsible for commencing and continuing the prosecution related to M&M because Defendants "told Stratton that there was something untoward and illegal about Gvozden selling tickets to end users through a travel agency that she owned, while she worked for Mill Runs," and "never corrected Stratton's misapprehension of the facts" from Defendants' first meeting with Stratton through closing arguments. [214] at 21.

In its prior order, the Court ruled for Defendants on this issue, concluding that even if "Mill Run misled Stratton" concerning the price at which Mill Run could purchase Croatia Air seats through another carrier, Stratton's "subsequent year-long independent investigation superseded their contribution to the investigation process." [222] at 19. Plaintiffs seek reconsideration of that ruling. They argue that Defendants "withheld from Stratton" "two crucial pieces of information" that "formed the bedrock of the charges" against Plaintiffs: (1) "Mill Run had no qualifications to become a travel agency other than establishing 'an office and a name' and having a tax id number"; and (2) "Mill Run could not book an itinerary with a Croatia Airlines segment at the same price through another airline as it could through Croatia Airlines directly." [224] at 4-5. Defendants argue that these omissions colored ASA Stratton's entire investigation, which was not "independent" under applicable case law, and therefore that there are disputed questions of fact concerning whether the commencement of the prosecution should be attributed to Defendants. The Court finds sufficient merit to Plaintiffs' argument to reinstate

their claim for malicious prosecution. In particular, there are material factual disputes concerning whether Defendants: (1) knowingly made false statements to ASA Stratton and, if so, those false statements were superseded by ASA Stratton's alleged independent investigation; or (2) actively encouraged the prosecution despite knowing that no probable cause existed.

### 1. Knowingly false statements to police

This Court's order on summary judgment did not directly address whether there was any evidence that Defendants knowingly gave false information to ASA Stratton. The Court concludes that Defendants are not entitled to summary judgment on this issue because there are facts in the record from which a reasonable trier of fact could conclude that Defendants knowingly provided false information to investigators.

First, Mill Run's attorney told ASA Stratton that Defendants "discovered [that Tabet] had diverted like a million dollars' worth of ticket sales to a competitor and wiped them off their computers." [218] at 10-11. A factfinder might find that this claim of a "discovery" was false and misleading if it believed Tabet's testimony that: (1) before leaving Mill Run he told the new branch manager, Defendant Daher, that he "had been purchasing Croatia Airlines tickets from Cosmopolitan when he had been working at Mill Run" (*id.* at 7); (2) before leaving Mill Run he told Daher about "the Iberia Airlines transaction through Cosmopolitan" and gave him a "copy with all the details of that group," including commission (*id.* at 8); (3) the practice of facilitating sales through another consolidator where Mill Run did not have a contract with an airline was done "so many times before on other carriers" that Mill Run did not have a contract with so Mill Run could keep the customers and avoid losing them to other consolidators (*id.* at 7); and (4) Defendants' admission that "[t]he Croatia Airlines tickets were not processed through Mill Run's sales reports because Mill Run did not 'buy' the tickets and did not pay for them" (*id.* at 6).

Second, a factfinder might find that Defendants' testimony concerning Mill Run's ability to get its customers tickets for travel in Croatia was false or misleading. Defendant Azzi stated in his deposition that he told ASA Stratton that even though Mill Run "could not get a contract" with Croatia Airlines, its managers "have the same product" and could sell Mill Run's customers the same product that Tabet was getting from Cosmopolitan [230] at 3. ASA Stratton recalled being told that Mill Run "could sell the same trip through another airline and just change the name of the plane" and thereby "book the same exact trips without it being, quote, 'Croatia Airlines.'" [209-36] at 130. A reasonable factfinder could find that telling ASA Stratton that Mill Run could get its customers the "same product" or the "same exact trips" from another carrier, without informing her of the difference in price, was false and misleading in light of the surrounding context. Defendants admit that "[t]he only way Mill Run could obtain airline segments with Croatia Airlines tickets would be through a package with an airline such as Lufthansa at an increased price of $200 per fare." [218] at 3. Defendants also agree with Tabet that Mill Run could not put its own mark-up on tickets purchased from Cosmopolitan, because if the tickets were marked up "$5, or even a single dollar, as a profit for [Mill Run], [Tabet] would not have been able to sell them" to Mill Run's customers. [218] at 6. These admissions give some credence to Plaintiffs' position that Defendants purposely gave ASA Stratton a misimpression that Tabet could have sold Mill Run's customers the same tickets that Tabet obtained from Cosmopolitan, while knowing that Tabet would have lost the customers if he had insisted that they buy the pricier Lufthansa tickets.

A third arguably false statement, which is contained in the criminal complaints signed on behalf of Defendant Daher, is that M&M was not a travel agency. See [209-37] at 2, 4. A factfinder could determine that this was a knowingly false statement in light of the following

assertions: (1) Defendant Azzi testified at Plaintiffs' criminal trial that "anybody could do a travel agent" given Mill Run's very minimal requirements ([118] at 2); (2) M&M was registered in Mill Run's computer system as a travel agent; and (3) other employees (including Defendant Daher) also operated travel agencies and bought tickets from Mill Run. Cf. *Doe v. City of Chicago*, 39 F. Supp. 2d 1106, 1113 (N.D. Ill. 1999) (genuine issue of material fact existed as to whether employee of private auto pound "commenced" criminal proceedings against owner of impounded vehicle, who was arrested for disorderly conduct after employee refused owner's requests to take property from her vehicle, by knowingly making a false statement to arresting officer, where plaintiff presented evidence that auto pound's written policy regarding removable personal property allowed her to take property and that city supervisor later allowed her to retrieve the items in dispute).

Having identified disputed questions of material fact concerning whether Defendants provided false information to ASA Stratton on the theft and wire fraud charges, the Court must examine whether Plaintiffs' prosecution was based on "separate or independently developed information." *Szczesniak*, 21 N.E.3d at 491. After considering the parties' further briefing of applicable Illinois case law, the Court concludes that it cannot determine as a matter of law that ASA Stratton's investigation was independent.

In *Randall v. Lemke*, 726 N.E.2d 183 (Ill. App. 2000), the defendant falsely reported to police that the plaintiff was in his vehicle with a gun. *Id.* at 184. The Appellate Court found that the defendant was not responsible for "commencing" the prosecution because the plaintiff was charged only with unrelated non-weapons offenses, which the police discovered while investigating the defendant's false report. *Id.* at 185-86. *Randall* adopted comment g to Restatement (Second) of Torts § 653, which is instructive here:

*g. Influencing a public prosecutor.* A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if it is left entirely to his discretion to initiate the proceedings or not. When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable under the rule stated in this Section even though the information proves to be false and his belief was one that a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

*If, however, the information is known by the giver to be false, an intelligent exercise of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information.* In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

Restatement (Second) of Torts § 653, comment g (1977) (emphasis added).

In this case, in contrast to *Randall*, there is evidence that ASA Stratton's decision to prosecute Plaintiffs was based on false information that she received from Defendants—including Daher's statement in the complaints that M&M was "not a travel agency" and Azzi's statement that Tabet could have obtained the "same product" Metropolitan sold—rather than on the results of her alleged "independent" investigation. Defendants initiated the criminal proceeding when Mill Run's attorney called ASA Stratton from New York and told her "something about the manager in Chicago they discovered had diverted like a million dollars' worth of ticket sales to a competitor and wiped them off their computers." [209-36] at 14. Defendants asked to meet with ASA Stratton in person to explain how Mill Run's business worked. *Id.* at 15. Mill Run's attorney, Defendant Azzi, and another of Mill Run's owners then

flew to Chicago to meet with ASA Stratton "to explain what they believed to be a criminal act." *Id.* at 24-25. They "told [her] about what their business was" and that they "didn't know about" the Croatia Air tickets and "didn't get any commissions." *Id.* at 25-26. After the meeting, they provided her with documents that Defendant Daher claimed to have discovered in the Mill Run office. *Id.* at 29.

ASA Stratton obtained grand jury subpoenas for documents from Cosmopolitan and from third parties, including travel agencies that bought Croatia Air tickets. She also subpoenaed Plaintiffs' bank records. See [209-36] at 31-50. Gvozden's bank records showed "a lot of checks to her personally, checks to her husband personally, checks to Chicago M&M and they were all—a lot of them were very obvious," "right in the memo section they were for tickets." *Id.* at 47-48. Nonetheless, "in a vacuum" all this meant to ASA Stratton was that Gvozden "was being paid for tickets." *Id.* at 48. ASA Stratton determined that "there needed to be more done on the case in order to charge anybody, because [she] wanted to hear * * * how things ran, how things worked," and "understand it better." *Id.* at 55. ASA Stratton "knew nothing about consolidators" herself. *Id.* at 57. ASA Stratton and a detective from the Lincolnwood Police Department, Detective Stewart, went to Mill Run's office to interview company employees. *Id.* at 58. Defendant Daher explained to ASA Stratton and Detective Stewart how he discovered the Croatia Air tickets. *Id.* at 63. Defendants told ASA Stratton that they were victimized because "[t]hey didn't get any commissions on their Croatia Air ticket sales, all to Cosmopolitan, and they were duped into paying Merima commissions that she did not earn through deception" and were "paying her commissions when they were already paying her to work as their employee." [209-36] at 116-17. The criminal complaints against Plaintiffs were signed on behalf of Defendant Daher. See [209-37].

Plaintiffs have also identified evidence suggesting that the ultimate failure of the prosecution was closely related to the allegedly false and misleading information that Defendants provided Stratton. At Plaintiffs' bench trial, the court granted a directed verdict on the wire fraud charge because it was predicated on a fact insufficiently supported by the government's evidence: that M&M was not a travel agency. See [222] at 14. The court found Plaintiffs not guilty of theft because it was unclear whether Mill Run suffered a loss and, if so, whether it was an actual economic loss or a loss of economic opportunity. *Id.* Given this record, a reasonable factfinder could determine that Defendants provided false information to ASA Stratton, that ASA Stratton acted on this information, that ASA Stratton's "intelligent exercise of * * * discretion was impossible," and that Defendants should not be relieved of responsibility for commencing the prosecution. Restatement (Second) of Torts § 653, Comment g (1977).

In another case discussed by both parties, *Szczesniak*, the defendant reported to police that the plaintiff wrote a check that he had insufficient funds to pay. 21 N.E. 3d at 491. The officer who took the report contacted the plaintiff and investigated the claim himself; he then transferred the case to a second officer, "who conducted another independent investigation," at the end of which the second officer "determined that sufficient evidence existed to seek a warrant for plaintiff's arrest" for writing bad checks. *Id.* The plaintiff argued that the defendant was responsible for commencing the criminal proceeding. The court disagreed, because the defendant's "statement about plaintiff's failure to make payments" was both true and in any event was "superseded and rendered immaterial by the independent investigations of two different police officers who developed sufficient evidence to seek plaintiff's arrest and prosecution" for writing bad checks. *Id.* at 492.

In this case, by contrast, there is still a material dispute concerning whether Defendants provided false information to ASA Stratton. More to the point, the Court cannot determine based on the record before it that ASA Stratton's investigation "superseded and rendered immaterial" the false or misleading information that Defendants provided. *Szczesniak*, 21 N.E. 3d at 492. Defendants focus on the fact that Stratton used subpoenas to obtain bank records and sales reports from third parties, as well as the fact that Stratton interviewed Plaintiffs prior to deciding to bring charges. However, ASA Stratton testified that after obtaining subpoenaed records, there needed to be "more done on the case in order to charge anybody"—in particular, Mill Run's employees needed to be interviewed again so Stratton could hear "how things ran, how things worked." [209-36] at 55. Defendants do not identify anything in the subpoenaed records that would have notified ASA Stratton that (1) Mill Run would have to pay $200 more to obtain Croatia Air tickets from another source, (2) Mill Run allowed anyone to buy tickets as a travel agent, or (3) that Tabet told Daher about the Croatia Air and Iberia ticket sales prior to leaving Mill Run—facts which one could expect Mill Run and its employees, but not outsiders, to know.

ASA Stratton did interview Plaintiffs prior to arresting them. Nonetheless, it is not clear from the record that Plaintiffs had an opportunity to correct Defendants' alleged false statements but failed to do so. According to Stratton, Tabet told her that what he was doing with the Croatia Air tickets was for the good of Mill Run, but she did not believe him. [209-36] at 106. A factfinder could determine that Stratton's assessment of Tabet, and her subsequent decision to seek an indictment, were tainted by the misinformation that Defendants provided. As to Gvozden, Stratton testified that Gvozden admitted that selling tickets through M&M was "wrong" and that "New York didn't know about it." [209-36] at 87. But there is no evidence

that Stratton and Gvozden discussed Mill Run's requirements for becoming a travel agent, whether M&M qualified under those minimal standards, or that Gvozden had knowledge of those standards. For these reasons, the Court cannot conclude that Stratton's investigation absolved Defendants of any responsibility for commencing the prosecution of Plaintiffs and Defendants are not entitled to summary judgment on Plaintiffs' malicious prosecution claims.

### 2. Continuation of prosecution

The Court next considers whether there are material facts in dispute concerning whether Defendants could be held liable for continuing the prosecution of Plaintiffs. Plaintiffs can avoid summary judgment by showing that Defendants "continued the proceeding by actively encouraging the prosecution despite knowing that no probable cause existed." *Szczesniak*, 21 N.E.3d at 491. Under this theory, "liability should be imposed where the defendant takes an 'active part in [the] prosecution after learning there is no probable cause for believing the accused guilty' and where its 'share in continuing the prosecution [is] active, as by insisting upon or urging further prosecution.'" *Denton*, 504 N.E. 2d at 760 (quoting Restatement (Second) of Torts § 655, comment C (1977)). In *Szczesniak*, the court determined that the defendant was not responsible for continuing the criminal proceedings against the plaintiff by not reporting to police that the plaintiff had entered into a payment plan with the plaintiff. The court found that the plaintiff had admitted in his deposition that there was no payment plan. 21 N.E.2d at 492. The court also recognized, but found inapplicable, dicta from an earlier appellate court decision, *Pratt v. Kilborn Motors, Inc.*, 363 N.E.2d 452 (Ill. App. Ct. 1977), that "where an informant has given a truthful account to the police, but has *withheld crucial information that would otherwise influence or stop the prosecution*, with the intent to paint a misleading picture and commence or continue the prosecution, '[s]trong argument can be made that for the complainant to give

truthful information indicating the commission of the offense later charged and to *withhold other information that would prevent the conduct complained of from being a crime* would also negate the prosecutor's exercise of discretion [and render the complainant liable for commencing or continuing the prosecution].'" *Szczesniak*, 21 N.E. 2d at 492 (emphasis added; alternation in *Szczesniak*) (quoting *Pratt*, 363 N.E. 2d at 455); see also *Pratt*, 363 N.E. 2d at 455 (holding that defendant auto dealer was not responsible for commencing the prosecution of plaintiff for deceptive practices, where defendant told police that plaintiff had stopped payment on his check but failed to tell police that there was a dispute between the parties concerning the sufficiency of the defendant's auto repairs, because the prosecutor brought the case based on his own legal error in believing that the incomplete facts stated to him constituted a deceptive practice, which they did not).

The Court concludes that Plaintiffs may be able to establish Defendants' liability for malicious prosecution based on the theory that Defendants "actively encourage[ed] the prosecution despite knowing that no probable cause existed." *Szczesniak*, 21 N.E.3d at 491. As explained above, there are material questions of fact concerning whether Defendants had probable cause to believe that Plaintiffs committed theft or wire fraud. There is also evidence that Defendants actively encouraged the prosecution. Daher was the named complainant on the criminal complaints (see [209-37]); Defendants provided ASA Stratton with documents concerning the Croatia Air and Iberia sales; ASA Stratton interviewed Mill Run employees before deciding to seek an indictment; and Defendant Azzi testified at the criminal trial (see [209-6]).

Under Plaintiffs' theory of the case, Defendants also "withheld crucial information that would otherwise influence or stop the prosecution" and that would "prevent the conduct

complained of from being a crime," with "the intent to paint a misleading picture and commence or continue the prosecution." *Szczesniak*, 21 N.E. 2d at 492. As to the Croatia Airlines tickets, Azzi explained to ASA Stratton that Plaintiffs could have sold Mill Run customers the same product that Plaintiffs obtained from Cosmopolitan, but allegedly withheld crucial information that arguably would have influenced or stopped the prosecution for theft: each ticket segment would be $200 more and Mill Run would lose business. If a trier of fact found Plaintiffs' story more credible than Defendants, it could conclude that Defendants knew that Plaintiffs had not taken anything of value from Mill Run, which would undermine probable cause for the theft charge.

As to the M&M sales, Defendant Daher filed criminal complaints stating that Plaintiffs committed wire fraud by ordering tickets from Mill Run "knowing that M&M was not a travel agency" ([209-37] at 2, 4), but Defendants allegedly withheld crucial information that arguably would have prevented the conduct from being a crime. "[A]nybody could do a travel agent" under Mill Run's policies, including for example an off-duty fireman who gives Mill Run "a tax ID and a billing address and an office, whether it's in his home or someplace else." [214-4] at 114. If a trier of fact found Plaintiffs' story more credible than Defendants', it could find that Defendants knew that M&M qualified as a travel agency under Mill Runs' minimal requirements, which also would undermine probable cause for the wire fraud charge.

For these reasons, the Court concludes that Defendants are not entitled to summary judgment on Plaintiffs' claims for malicious prosecution and therefore reinstates those claims.

## C. False Arrest

In its summary judgment order, the Court held that the "independent investigation defense" also applied to Plaintiffs' claim for false arrest. [222] at 19. The Court explained that

"although the independent investigation defense usually appears in the malicious prosecution context, the analysis is applicable to the false arrest claim because the arrest occurred the same day that the criminal proceedings commenced." *Id.* By applying the "independent investigation" exception to the false arrest claim, this Court essentially held that the state—rather than Defendants—procured the restraint of Plaintiffs based on Stratton's investigation. The Court reexamines this holding because it did not directly apply the case law concerning when a private citizen "procures the restraint" of another for purposes of a false arrest claim.

"To state a cause of action for false imprisonment, the plaintiff must allege that his personal liberty was unreasonably or unlawfully restrained against his will and that defendant(s) caused or procured the restraint." *Vincent v. Williams*, 664 N.E.2d 650, 654 (Ill. App. 1996). In a false arrest case, a plaintiff may recover against a private defendant who supplied information to police if he can establish that the defendant "1) directed the officer to arrest the plaintiff or 2) procured the arrest by giving information that was the sole basis for the arrest." *Randall*, 726 N.E.2d at 186; see also *Carey v. K-Way, Inc.*, 728 N.E.2d 743, 748 (Ill. App. 2000) ("a defendant may be liable for false arrest even if he or she is not the arresting officer's sole source of information if the defendant goes beyond 'providing information' and actually requests the arrest"). "In contrast to malicious prosecutions claims, the Seventh Circuit and Illinois courts have held that giving false information to a police officer does not constitute 'participating' in a false arrest"; instead, "a defendant must go beyond providing the information leading to the arrest and actually request and obtain the arrest." *Olinger v. Doe*, 163 F. Supp. 2d 988, 990 (N.D. Ill. 2001) (citing *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 326 (7th Cir. 1978); *Pease v. Int'l Union of Operating Engineers Local 150*, 567 N.E.2d 614, 618 (Ill. App. 1991)).

Applying these standards, Defendants are not entitled to summary judgment if there are disputed questions of fact concerning whether: (1) Defendants directed Stratton/Lincolnwood police to arrest Plaintiffs; or (2) Defendants provided the information that was the sole basis for the arrest. It is undisputed that the information Defendants provided was *not* the *sole* basis for Plaintiffs' arrest—though under Plaintiffs' theory it was the but-for cause of their arrest. Stratton performed her own investigation of Defendants' allegations, including subpoenaing documents from third parties and interviewing Plaintiffs. Whether Defendants directed authorities to arrest Plaintiffs, or merely provided information, is a question of fact that is examined on a case by case basis. *Carey*, 728 N.E.2d at 748 (citing 32 Am. Jur. 2d False Imprisonment § 41 (1995); *Lindquist v. Friedman's, Inc.*, 1 N.E.2d 529, 533 (Ill. App. 1936)). The Court concludes that there are facts in the record upon which a reasonable trier of fact could find that Defendants directed Plaintiffs' arrest. Most notably, the criminal complaints that were filed against Plaintiffs on June 18, 2008—the same day Plaintiffs were arrested—all name Defendant Daher as the complainant and all are signed "Det. Stewart for Jimmy Daher." [209-37]. To the extent that the independent investigation defense applies to false arrest claims, the Court concludes, for the same reasons discussed above in relation to the malicious prosecution claims, that there are disputed questions of fact concerning whether the defense applies. Therefore, the Court finds that Defendants were not entitled to summary judgment on Plaintiffs' claims for false arrest and reinstates those claims as well.

**IV.    Conclusion**

For these reasons, the Court grants Plaintiffs' motion [224], vacates its prior order [222] in part, and reinstates Plaintiffs' claims for false arrest and malicious prosecution.  This case is set for further status hearing on March 24, 2016 at 9:45 a.m.

Dated: March 11, 2016

_____
Robert M. Dow, Jr.
United States District Judge